UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BRANDON MOORE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-13611** |
| **S.W. "SANDY" McCAIN, WARDEN** | **SECTION: "H"(3)** |

**REPORT AND RECOMMENDATION**

Petitioner, Brandon Moore, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On April 24, 2014, petitioner was convicted of attempted forcible rape under Louisiana law.[1] On May 30, 2014, he was sentenced to a term of fifteen years imprisonment, and it was ordered that one year of that sentence be served without benefit of parole, probation, or suspension of sentence.[2] After he was granted an out-of-time appeal,[3] the Louisiana Fifth Circuit Court of Appeal affirmed his conviction on March 15, 2017. However, finding that the imposed sentence was illegal because the law required that at least *two* years of the sentence be served without benefit of parole, probation, or suspension of sentence, the Court of Appeal remanded the matter to the state district court for resentencing.[4] On April 28, 2017, petitioner was resentenced to a term of

---

[1] State Rec., Vol. 4 of 5, transcript of April 24, 2014, p. 107; State Rec., Vol. 1 of 5, minute entry dated April 24, 2014; State Rec., Vol. 1 of 5, jury verdict form.
[2] State Rec., Vol. 4 of 5, transcript of May 30, 2014; State Rec., Vol. 1 of 5, minute entry dated May 30, 2014.
[3] State Rec., Vol. 2 of 5, Order dated August 27, 2015.
[4] State v. Moore, 215 So. 3d 951 (La. App. 5th Cir. 2017); State Rec., Vol. 2 of 5.

fifteen years imprisonment, and it was ordered that two years of that sentence be served without benefit of parole, probation, or suspension of sentence.[5]

On March 21, 2018, petitioner wrote a letter to the Louisiana Supreme Court.[6] In that letter, he alleged that that he had given a writ application to prison officials for mailing on April 4, 2017, enclosed a copy of that application, and requested an update regarding the application's status. Not having received any such application previously, the Louisiana Supreme Court treated that correspondence as a writ application and, on November 14, 2018, issued a judgment stating: "Not Considered. Not timely filed. See La.S.Ct. Rule X, § 5(a)."[7]

On December 6, 2018, petitioner then filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[8] The state filed a response arguing that the federal application was untimely.[9] Petitioner filed a reply to that response.[10]

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[11] For AEDPA

---

[5] State Rec., Vol. 2 of 5, minute entry dated April 28, 2017.

[6] State Rec., Vol. 5 of 5. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to this letter, the Court will simply use the date of the letter as the filing date, in that the letter could not have been placed in the mail any earlier than that date.

[7] State v. Moore, 256 So. 3d 283 (La. 2018); State Rec., Vol. 5 of 5.

[8] Rec. Doc. 4. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Under penalty of perjury, petitioner declared that he placed his federal application in the prison mailing system on December 6, 2018. Rec. Doc. 4, p. 8.

[9] Rec. Doc. 15.

[10] Rec. Doc. 16.

[11] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case. Here, both petitioner and the state argue that § 2244(d)(1) applies. See Rec. Doc. 4-1; Rec. Doc. 15, pp. 7-10.

purposes, a state court criminal judgment consists of the conviction and the sentence, and the judgment is therefore not considered "final" until *both* the conviction *and* the sentence are final. See Burton v. Stewart, 549 U.S. 147, 156-57 (2007); Scott v. Hubert, 635 F.3d 659, 665-67 (5th Cir. 2011).

With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003). However, "[i]f the defendant stops the appeal process before that point, … the conviction becomes final when the time for seeking further direct review in the state court expires." Id. at 694; see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. See Foreman, 383 F.3d at 338-39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. See Causey v. Cain, 450 F.3d 601, 606 (5th Cir. 2006); Roberts, 319 F.3d at 693. Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal."

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

In the instant case, although petitioner was originally convicted and sentenced in 2014, he was *resentenced* on April 28, 2017. Accordingly, the state argues that because petitioner did not

appeal his new sentence, his state criminal judgment became final when his thirty-day period for filing such an appeal expired.[12] That date was May 30, 2017.[13]

Petitioner counters that his state criminal judgment did not become final on that date because he timely sought review of the Court of Appeal's judgment affirming his conviction. *If that allegation were true,* then pursuant to Butler, his state criminal judgment would not have become final until February 12, 2019, i.e. ninety days after the Louisiana Supreme Court's ruling.

However, as noted, the Louisiana Supreme Court expressly rejected petitioner's contention that he had timely filed a writ application challenging the Court of Appeal's judgment.[14] Further, although petitioner continues to assert that he gave a writ application to prison officials for mailing to the Louisiana Supreme Court on April 4, 2017, he has provided no evidence whatsoever in support of that allegation other than his own self-serving statement. On the other hand, the respondent has submitted evidence from prison officials which states:

> Brandon Moore, DOC # 625091, did not present any legal mail to prison officials for mailing in April of 2017. Had he done so, his prison mail log would have shown that he withdrew funds for Postage. His mail log does not reflect any withdrawal of funds in April of 2017. Specifically, he did not present any legal mail to prison officials for mailing to the Louisiana Supreme Court until March of 2018.[15]

Therefore, based on the record before it, this Court has no reason to second-guess the Louisiana Supreme Court's ruling that no such application was filed on April 4, 2017. Accordingly, the Court finds that petitioner's state criminal judgment became final on May 30,

---

[12] Rec. Doc. 15, pp. 8-9. Under Louisiana law, a criminal defendant has thirty days to file a motion to appeal his conviction or sentence. La. Code Crim. P. 914.

[13] The state inadvertently miscalculated this date. Because the thirtieth day here fell on a Sunday, and because the following day was Memorial Day, petitioner had until Tuesday, May 30, 2017, to file an appeal. See La. Code Crim. P. art. 13; La. Rev. Stat. Ann. § 1:55.

[14] State v. Moore, 256 So. 3d 283 (La. 2018) ("Not Considered. Not timely filed. See La.S.Ct. Rule X, § 5(a)."); State Rec., Vol. 5 of 5.

[15] Rec. Doc. 15-1.

2017.  As a result, his one-year federal limitations period for seeking habeas corpus relief commenced on that date and then expired on May 30, 2018, unless the statute of limitations was tolled.  For the following reasons, the Court finds that it was not.

The Court first considers statutory tolling. The AEDPA provides:  "The time during which a properly filed application for *State post-conviction or other collateral review* with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2) (emphasis added).

During his one-year limitations period, petitioner filed no applications for post-conviction or other collateral review.  Rather, his only filing during that period was his letter the Louisiana Supreme Court, which was filed on March 21, 2018, and construed by that court as an untimely writ application.

However, because that application was seeking further *direct review*, it did not trigger statutory tolling under § 2244(d)(2).  The United States Fifth Circuit Court of Appeals has expressly and conclusively held:  "Under that provision it is only state *post-conviction relief proceedings* that cause tolling."  Butler, 533 F.3d at 318 (emphasis added).  Accordingly, an untimely *direct-review* writ application, such as the one in the instant case, does *not* toll the federal limitations period.  See id. at 320 ("Filings that are not part of habeas or post-conviction proceedings do not invoke Section 2244(d)(2) tolling. … The only document Butler filed related to his untimely direct review application was the application itself, which is indisputably a part of his direct appeal proceedings."); Johnson v. Cain, Civ. Action No. 12-974, 2013 WL 5961101, at *4 (E.D. La. Nov. 7, 2013); Allen v. Tanner, Civ. Action Nos. 11-927 and 11-1601, 2011 WL 4344586, at *2 (E.D. La. Aug. 19, 2011), adopted, 2011 WL 4345081 (E.D. La. Sept. 15, 2011).

Therefore, simply put: because that filing sought further *direct review*, and because petitioner filed no state applications seeking *post-conviction or other collateral review* on or before May 30, 2017, he is not entitled to statutory tolling under § 2244(d)(2).

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "equitable tolling is unavailable in most cases …." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). Indeed, the Supreme Court held that "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (internal quotation marks omitted).

In the instant case, petitioner is conceivably seeking equitable tolling on two bases.

First, as already noted, petitioner alleges that he gave a writ application to prison officials for mailing to the Louisiana Supreme Court on April 4, 2017, but, for some unknown reason, that writ application was never received by the Louisiana Supreme Court. However, as discussed above, the Louisiana Supreme Court rejected that allegation and the evidence before this Court casts no colorable doubt on the Louisiana Supreme Court's ruling.

Second, although he does not expressly say as much, petitioner seems to suggest that he did not receive notice of the Louisiana Fifth Circuit Court of Appeal's decision affirming his conviction.[16] It is clear that, in some circumstances, "[l]ong delays in receiving notice of state

---

[16] See Rec. Doc. 16.

6

court action may warrant equitable tolling." Hardy v. Quarterman, 557 F.3d 596, 598 (5th Cir. 2009).

However, as an initial matter, it must be noted that any suggestion that petitioner did not receive notice of the Court of Appeal's decision of March 15, 2017, would be directly contrary to his repeated assertions that he sought review of that decision on April 4, 2017.

Moreover, in any event, petitioner presents no evidence whatsoever, such as prison mail logs, showing that he did not receive notice of the decision. Instead, he argues only that the *respondent has failed to prove that he did receive it*. However, that is immaterial for the purposes of equitable tolling. It is the petitioner – *not* the respondent – who bears the burden of proof on equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).

In addition, the Court notes that petitioner was *represented by counsel* on direct appeal, and the state court record shows that the Court of Appeal's judgment was mailed to *both* petitioner *and* his attorney on the date the judgment was rendered.[17] Therefore, even if petitioner were able to prove that he did not receive the copy of the judgment mailed directly to him by Court of Appeal, the notice sent to his counsel would still suffice and defeat any request for equitable tolling. See Lewis v. Cockrell, No. 00-10836, 2002 WL 432658, at *4 (5th Cir. Mar. 5, 2002) ("We have never held that a habeas petitioner who, represented by counsel, failed to receive timely notice of a state court's ruling should be entitled to equitable tolling as a result."); see also O'Veal v. Davis, 664 F. App'x 355, 357 (5th Cir. 2016) ("[Petitioner] has not pointed to any authority suggesting that an attorney's failure to notify a defendant of the status of his case rises to the level of an extraordinary circumstance that prevents the defendant from timely filing a federal habeas petition.").

---

[17] State Rec., Vol. 5 of 5, Notice of Judgment and Certificate of Delivery.

For all of these reasons, the Court finds that petitioner has failed to establish that he is eligible for either statutory or equitable tolling.

Lastly, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

Here, petitioner has not invoked Perkins. However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that he has not made the showing required under Perkins for the following reasons.

In assessing a petitioner's claim of actual innocence, a court normally first examines the evidence presented at trial and on which the conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474

(5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014). In the instant case, the Louisiana Fifth Circuit Court of Appeal summarized that evidence as follows:

> At trial, J.J. testified.[FN 1]  Before Hurricane Isaac struck, in late August of 2012, J.J., Defendant, and J.J.'s children – H.J. and B.M. – lived on East Hermes in New Orleans.[FN 2] According to J.J., H.J. had known Defendant since she was one and one-half years old, and she and Defendant were very close.
>
>> [FN 1] To observe the principle of protecting minor victims and victims of sexual offenses set forth in La. R.S. 46:1844(W)(3), the victim and any witness whose name can lead to the victim's identity, i.e., parent, sibling, or relative with the same last name as the victim, will be identified by initials only.
>>
>> [FN 2] J.J. and Defendant have been married since September 20, 2005.  J.J. identified Defendant in court and referred to him as her husband.
>
> When J.J. and Defendant got into an argument during August of 2012, Defendant moved out of the residence at East Hermes and began living with Nadia Moore, his son's mother, in an apartment on Ute Drive on the westbank of Jefferson Parish.  At the end of August 2012, Hurricane Isaac struck and Defendant evacuated with H.J., B.M., Nadia, and her children to his mother's house in Texas.  J.J. allowed Defendant to take H.J. and B.M. and stayed behind, since she and Defendant "weren't seeing eye to eye."
> When Defendant, Nadia, and the children returned to the New Orleans area three or four days later, they went to stay at Nadia's house on Ute Street because J.J. was due to have surgery during early September and there was still no electricity in New Orleans East.  After living with Nadia, Defendant and the children returned home to East Hermes the first week of October 2012.[FN 3]  J.J. noticed that from August of 2012 until February of 2013, H.J. was withdrawn and stayed in her room. She said that H.J.'s grades dropped and the way she dressed had changed.
>
>> [FN 3] The testimony was inconsistent as to how long Defendant and the children stayed at Nadia's house.  Defendant testified that they stayed there for one and one-half to two months or longer.  Nadia testified that the children stayed there for two or three weeks, and Defendant stayed there during the month of September.  At trial, H.J. remembered they returned home to East Hermes during early October since they were back before her birthday on October 11th.
>
> At trial, H.J., the victim, testified that she had known Defendant her entire life and thought of him as a father figure.[FN 4]  H.J. state [sic] that Defendant began to act differently towards her sometime before Hurricane Isaac hit.  She described one incident "in the east" where she was unaware that Defendant was watching her dance in the computer room.  Afterwards, he alluded that she knew

9

how to have sex.  Around the time of Hurricane Isaac, H.J., who was 13 years old, had a boyfriend, N.R., who lived in Gretna.  Defendant and H.J. spoke of her feelings for N.R.[FN 5]  Defendant told H.J. that she "was ripe" and "ready" to start having sex.  He drove N.R.'s [sic] house to have sex with him, and after H.J. and N.R. had sex, Defendant asked her how it felt.

> [FN 4] H.J. identified Defendant in court.
>
> [FN 5] N.R. denied that he and H.J. ever dated but said that they only had a sexual relationship.  He testified that the second time he and H.J. had sex, he did not use a condom.  Three days later, he began "burning" and learned that he had a sexually transmitted infection.  He could not recall whether he had chlamydia or gonorrhea.

H.J. testified that one evening a couple of weeks after she had sex with N.R., and while still living at Nadia's house on the westbank, Defendant called her into the room he shared with Nadia and exposed himself.  H.J. left the room but returned when Defendant called her back.  H.J. described that Defendant rose out of a chair as he told her that he knew that she and her boyfriend had sex, and he pushed H.J. on the bed.  H.J. testified that Defendant held her hands above her head as she squirmed to get him off.  Defendant told H.J.: "Come on, you gave him some, why you can't give me none."  He then pulled H.J.'s shorts to the side and put his exposed penis inside her vagina.  H.J. attempted to squeeze her legs closed, tried to fight back, and kept telling Defendant to get off of her.  Defendant eventually got off of H.J., insulted her, and told her to get out.[FN 6]

> [FN 6] At trial, H.J. could not remember the exact date of this incident.  However, she stated that it was after her sister's birthday, which was September 23rd.

H.J. described another incident that occurred after she had moved back to East Hermes when Defendant came into her room while she had the lights off and felt her vagina under her clothes.  She testified that Defendant inserted his penis inside her anus.  She also recalled the time when Defendant asked her for a hug, he reached in her shirt and put his mouth on her breast under her clothes.  Defendant told H.J. that if she told anyone he would kill himself.  H.J. testified that she loved Defendant, did not want him to kill himself, and was scared.  She did not tell anyone what happened for a while, but eventually she told Mr. Armon Dauphin, a social worker at McMain.[FN 7]  However, she did not tell Mr. Dauphin everything.

> [FN 7] Mr. Dauphin later testified that "McMain" is Eleanor McMain High School.

Around January or February of 2013, J.J. decided to speak with H.J. "about the birds and the bees," after learning a friend's 15-year-old niece was pregnant.  J.J. questioned H.J. about whether she was "talking to boys," as J.J. had told her not to.  J.J. described that during this discussion, Defendant, who usually acted as a father figure, retrieved a gun out of a closet and stated that he could shoot someone

10

from 40 yards.  H.J., who was crying, admitted to her mother that she had been talking to boys, and J.J. told H.J. she was going to take her to the doctor to see if she had been penetrated.  H.J. was worried that her mother would find out about Defendant and her boyfriend, so she told J.J. that she wanted to take a ride with her to get something to eat.  Before H.J. left, she told Defendant that she was going to tell her mother what happened, and Defendant told her she was going to have to lie.

During the ride, J.J. described that H.J. began crying so hard that she asked her if she was pregnant.  Concerned, J.J. told H.J to "just let it out ... You won't be the first, you won't be the last."  H.J told her mother that Defendant "had brought her by Nadia" and "brought her by a boy named [N.R.]."

After a few hours, J.J. and H.J. returned to the house but did not say anything.  Later that evening, J.J. confronted Defendant and asked him where he had brought H.J. and what he did to her.  J.J. stated that Defendant tried to console her as she was distraught.  When J.J. woke up later, Defendant had taken the guns and left the house.  On Monday morning, J.J. saw that Defendant had dropped off the car with his phone in it.  J.J. called the police at four o'clock on Monday morning.

Officer Toka Clark with the New Orleans Police Department ("N.O.P.D.") 7th District testified that, on February 25, 2013, she responded to a call of a possible sexual assault on East Hermes.  On the scene, Officer Clark spoke with J.J. and H.J., and Defendant kept calling J.J.  At first, Officer Clark instructed J.J. not to answer, but when he continued to call and J.J. was upset, Officer Clark told her to answer it.  While Defendant and J.J. were on the phone, J.J. asked Officer Clark to follow her into her vehicle where she put Defendant on speaker.  Officer Clark was able to hear Defendant apologizing to J.J. for touching his stepdaughter inappropriately but that it was only once and for taking her to her boyfriend's house to have sex.  Officer Clark subsequently notified the child abuse unit.

Detective Akron Davis, who was with the N.O.P.D. child abuse unit on February 25, 2013, was dispatched to East Hermes.  Upon arrival, Detective Davis spoke with J.J., who informed him of H.J.'s allegation that she was sexually assaulted by her stepfather, who he learned was Defendant.  Detective Davis referred H.J. to the Audrey Hepburn Child Advocacy Center at Children's Hospital ("CAC") and met J.J. and H.J at the CAC.  There, Detective Davis briefed Daniel Dooley, the interviewer, and monitored the recorded interview from a different room.

During the February 25, 2013 forensic interview,[FN 8] H.J. said she was 14 years old and a freshman at McMain High School.  She identified Defendant by name and as her stepfather.  She detailed that Defendant "messed" with her and described the first incident as on 6928 East Hermes, when Defendant told her that she looked like she knew how to "work" a penis after seeing her dance.

> [FN 8] Daniel Dooley, a forensic interviewer with the CAC, conducted the interview with H.J. on February 25, 2013.  He authenticated that the DVD recording was a fair and accurate representation of the interview with H.J. made on that date.

11

H.J. stated during the interview that Defendant began to frequently touch and feel her inappropriately when she and her sister went to live with another woman in an apartment on the westbank when her mother had surgery. She similarly described that Defendant told her that she was "ripe" and "ready," and that he took her to have sex with N.R. When Defendant found out H.J. had sex with N.R., he asked her how it felt and why she could not have sex with him, since she had sex with N.R. She elaborated that also while on the westbank, Defendant pushed her against the bed, and she told him to stop. She recounted that Defendant tried to pull her shorts to the side, took the tip of his penis out, and asked her to let him put the tip in. H.J. said she kept trying to close her legs but said that the tip of Defendant's penis touched her. When she would not allow him to put the tip in, he called her a "buster."

She similarly recounted the time when Defendant asked for a hug, and when he reached in, he pulled her shirt down and put his mouth on her breast. Another time, she was riding in the car with Defendant when he reached over and put his finger inside of her vagina. H.J. also described one time "in the east" when she was lying down on her stomach and Defendant came into her room, tried to move her shorts, and put his finger inside her vagina. Defendant advised H.J. that if she had anal sex, her mother would not be able to find out if H.J. went to the doctor.

When asked if anyone ever saw any of this, H.J. described that Defendant tried to "mess with" her friend K.W. one day when her friend was at their house. K.W. told H.J. that she saw Defendant playing with himself when she went into the kitchen. Defendant then asked K.W. if she saw his penis and if she thought it was big. K.W. told H.J. that Defendant asked her what she liked to do and told her not to tell H.J. H.J. thought K.W. told her this sometime in January. H.J. further explained that Defendant called her his "roll dog" and said that if she said anything, he would blow his brains out. She looked at him like a father and did not want to hurt her mother, which put her in a "messed up" position.[FN 9]

> [FN 9] At trial, K.W. testified that she has known H.J. since fourth grade and has known Defendant just as long. K.W. described another incident with Defendant where he drove H.J. and K.W. to a party. Once they arrived, H.J. exited the vehicle and while Defendant and K.W. were alone, he pulled his penis out and asked her to "ride it." K.W. said she stopped going to H.J.'s house after that because K.W. saw Defendant as a father figure.

Dr. Neha Mehta,[FN 10] the medical director of the CAC, testified that she conducted an interview and a medical examination of H.J. on February 27, 2013.[FN 11] During the interview, H.J. disclosed to Dr. Mehta that she and N.R. had penile and/or vaginal intercourse with a condom. As to Defendant, she informed Dr. Mehta that her stepfather had put his finger in her vagina on more than one occasion, and that he had tried once to put the tip of his penis inside her vagina. Dr. Mehta testified that H.J. reported that Defendant had put his finger into her anus and tried to put the tip of his penis into her anus. H.J. disclosed to Dr.

Mehta that her stepfather had pulled down her shirt and had oral contact to her breast area. H.J. explained that Defendant had made her "masturbate him," and that he had shown her pornographic films to which he made lewd comments. Dr. Mehta's opinion was that H.J. gave a very clear and detailed history of the multiple types of sexual contact that occurred with Defendant.

>[FN 10] Dr. Mehta was qualified as an expert in child abuse pediatrics.
>
>[FN 11] The CAC medical records and transcript of the interview conducted by Dr. Mehta, and to which she testified, were admitted into evidence.

As to the medical examination, Dr. Mehta reported H.J.'s physical examination as normal, which she stated was consistent with the history that H.J. provided and with her physical maturity rating. H.J. reported to Dr. Mehta that she had been menstruating since age eleven, and Dr. Mehta rated H.J.'s genitalia as a four out of a possible range of five on the scale for genital maturity, meaning that the genital area is better able to accommodate touching or penetration without sensitivity or expectation of injury. Dr. Mehta provided that a normal examination does not indicate that sexual abuse did not occur. She explained that children who are victims of sexual abuse often do not have injuries, since many children do not report abuse immediately, giving the skin time to heal. She referenced a study where 36 pregnant teenage females were examined and only two out of the 36 women had findings that suggested penetration to the examiner. Dr. Mehta conducted a test for sexually transmitted diseases on H.J., which H.J. tested positive for gonorrhea, a sexually transmitted infection, but Dr. Mehta denied being able to determine from whom or when she obtained the infection.

Dr. Mehta explained that the majority of children of sexual abuse delay disclosure. Dr. Mehta explained that older children typically delay disclosure because of external factors, such as threats of harm or fear. However, there are also internal reasons, such as feelings of guilt or disgust. In this case, Dr. Mehta described that H.J. had feelings of blame, shame, and guilt, which were indicated by her statements that Defendant told her not to say anything, that he would kill himself, and he did not want to hurt her mother. Dr. Mehta also described a process called "grooming," which consists of those acts or behaviors a person sexually interested in a child will do to facilitate access to the child or make a connection with the child. Dr. Mehta testified that a preexisting relationship makes grooming an easier process, which includes when the relationship is with the parent of the child. Dr. Mehta suggested that this can cause conflict and stress for the child, who may not want to create chaos or disruption among loved ones.

Based upon H.J.'s statements during the forensic interview, Detective Davis visited Mr. Armon Dauphin, H.J.'s school counselor at McMain, who reported seeing H.J. upon referral by the school nurse for depression. During their second meeting, on December 18, Mr. Dauphin asked H.J. if she had been physically, sexually, or emotionally abused. H.J. reported that something happened but would not go into details. She told Mr. Dauphin that her mom would "blow up" and

probably not believe her.  Mr. Dauphin testified that H.J. "clammed up at that point."

Given H.J.'s allegations in Jefferson Parish, Detective Davis called Detective Jean Lincoln in Jefferson Parish and apprised her of the situation. Detective Lincoln reviewed the case file and met with H.J. and J.J., and H.J. consistently disclosed to Detective Lincoln the allegations.  Detective Lincoln obtained an arrest warrant for Defendant, who was subsequently arrested.

At trial, Defendant denied bringing H.J. to N.R.'s house to have sex with him and testified that he was shocked when H.J. told him that she had sex.  He claimed that he did not tell J.J. because J.J. "would have beat her to death."  He denied being home alone with H.J. on Ute Street or sexually abusing H.J.  Prior to Defendant's testimony, the State published a recorded jailhouse call wherein Defendant asked to speak to H.J. and told her he was "sorry for everything." Defendant testified at trial that he told H.J. he was "sorry for everything" in the call, since he was incarcerated and was unable to provide for his family.[FN 12] Defendant denied having any sexually transmitted diseases or knowing whether Nadia had any sexually transmitted diseases.

> [FN 12]  The recorded jailhouse calls were admitted into evidence. Only a portion of the calls was published to the jury.[18]

The Louisiana Fifth Court of Appeal then went on to reject petitioner's claim that the foregoing evidence was insufficient to support his conviction, holding:

> In his counseled and *pro se* assignment of error, Defendant claims that the evidence was insufficient to support his conviction of attempted forcible rape.[FN 14]  Specifically, Defendant challenges the degree of force committed by him upon H.J. and argues that the force employed was so minimum [sic] that it did not amount to force or threats of physical violence where H.J. reasonably believed that the resistance would not prevent the contact.  He argues that he ceased his actions when H.J. resisted to the slightest.  Defendant contends that the evidence of force presented only supports a conviction of sexual battery, instead of attempted forcible rape.[FN 15]
>
>> [FN 14]  Defendant failed to file a motion for post-verdict judgment of acquittal, challenging the sufficiency of the evidence pursuant to La. C.Cr.P. art. 821. However, such failure does not preclude appellate review of the sufficiency of the evidence.  See State v. Allen, 440 So.2d 1330 (La. 1983); State v. Washington, 421 So.2d 887 (La. 1982); State v. Brown, 01-41 (La.App. 5 Cir. 5/30/01); 788 So.2d 694, 699 n.6; State v. Girod, 94-853 (La. App. 5 Cir. 1995); 653 So.2d 664.
>>
>> [FN 15]  We note that the April 24, 2014 trial minute entry provides that the jury charges were discussed in chambers and read to the jury without objection.  The

---

[18] State v. Moore, 215 So. 3d 951, 955-60 (La. App. 5th Cir. 2017); State Rec., Vol. 2 of 5.

14

> written jury charges reveal an instruction as to attempted forcible rape, and at the time of the reading of the instructions, the trial judge stated on the record that they were acceptable to both sides, and defense counsel agreed. During deliberations, the jury requested that the charges be read again, which the trial judge complied. Therefore, the record fails to indicate that Defendant lodged any objection to the responsive verdicts, which included attempted forcible rape of which he was convicted. When a defendant does not object to a legislatively responsive verdict, the defendant's conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State *ex rel.* Elaire v. Blackburn, 424 So.2d 246, 252 (La. 1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); Alexander, *infra* at 127; State v. Austin, 04-993 (La.App. 5 Cir. 3/1/05); 900 So.2d 867, 878, writ denied, 05-0830 (La. 11/28/05); 916 So.2d 143. Thus, we will review the merits of Defendant's assignment of error.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La. 6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Alexander, 12-194 (La.App. 5 Cir. 5/16/13); 119 So.3d 120, 126, writ denied, 13-1337 (La. 12/6/13); 129 So.3d 529; State v. Mickel, 09-953 (La.App. 5 Cir. 5/11/10); 41 So.3d 532, 534, writ denied, 10-1357 (La. 1/7/11); 52 So.3d 885.

Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Alexander, *supra*; State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08); 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id. It is not the function of the appellate court to assess the credibility of the witnesses or reweigh the evidence. State v. McGinnis, 04-1286 (La.App. 5 Cir. 10/6/05); 917 So.2d 471, 481, writ denied, 05-2469 (La. 4/28/06); 927 So.2d 283.

When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. Alexander, 119 So.3d at 126; State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04); 875 So.2d 949, 955, writ denied, 04-1605 (La. 11/15/04); 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. Alexander, *supra* at 126; State v. Dixon, 07-915 (La.App. 5 Cir. 3/11/08); 982 So.2d 146, 153-54, writ denied *sub nom.*, State *ex rel.* Dixon v. State, 08–987 (La. 1/30/09); 999 So.2d 745. Specifically in sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does

15

not introduce medical, scientific, or physical evidence to prove the commission of the offense. Id.

In the present matter, Defendant was charged with forcible rape but was found guilty of the responsive verdict of attempted forcible rape, in violation of La. R.S. 14:27 and 14:42.1. Defendant argues in his brief that the degree of force he employed against H.J. was too minimal to support his conviction for attempted forcible rape. Defendant avers that he employed only a minimal amount of force to engage in the contact with the victim, and that he stopped when H.J. kept trying to squeeze her legs closed. Thus, he argues that the evidence, when viewed in the light most favorable to the prosecution, was only sufficient for a conviction of sexual battery.

At the time of the offense, La. R.S. 14:42.1(A)(1) defined forcible rape,[FN 16] in pertinent part, as:

> [R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

Any sexual penetration, however slight, is sufficient to complete the crime, and emission is not necessary. See La. R.S. 14:41(B). The testimony of the victim can be sufficient to establish sexual penetration, even though there is an absence of scientific evidence of sexual intercourse. State v. Hawkins, 06-739 (La.App. 5 Cir. 9/25/07); 968 So.2d 1082, 1088, writ denied, 07-2272 (La. 4/18/08); 978 So.2d 347.

> [FN 16]  Forcible rape is a general intent crime. State v. Smith, 35,699 (La.App. 2 Cir. 4/5/02); 815 So.2d 412, 421, writ denied, 02-1502 (La. 4/4/03); 840 So.2d 1200.

La. R.S. 14:27(A) and (C) defined attempt as:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> ***
>
> An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime,

16

>although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuant of such attempt.

To support a conviction for attempted forcible rape, the State must prove that defendant had the specific intent to commit forcible rape and that he did an act for the purpose of, and tending directly toward, the accomplishment of his objective. See La. R.S. 14:27 and 14:42.1. Specific intent need not be proven as a fact but may be inferred from the circumstances and the actions of the defendant. State v. Strickland, 04-843 (La.App. 5 Cir. 3/1/05); 900 So.2d 885, 890, writ denied, 05-820 (La. 6/17/05); 904 So.2d 683.

In State v. Carter, 04-482 (La.App. 5 Cir. 10/26/04); 888 So.2d 928, 934-35, this Court upheld the defendant's conviction for forcible rape and found the evidence of the element of force was sufficient where the victim, who was 14 years old at the time of the incident, testified at trial that the defendant, an adult who was larger and stronger than her, picked her up out of bed and carried her to his bedroom, despite her verbal protests. She further testified that the defendant pushed her into a reclining position on his bed and pinned both of her hands behind her back. When she tried to free her hands, the defendant gripped them tighter. The victim also testified at trial that the defendant put his penis into her vagina. Id.

Although in Carter, *supra*, the victim was unable to physically resist the defendant, here, H.J. was able to resist Defendant's advances eventually. At trial, H.J. recounted one specific incident that occurred on the westbank after Hurricane Isaac where Defendant exposed himself to her, pushed her down on the bed, held her hands above her head, and put the tip of his penis inside of her. H.J. testified that she squirmed to get him off, kept trying to squeeze her legs closed, and told Defendant to get off of her. Defendant then called her a "buster" and told her to get out. The testimony indicated that H.J. was 14 years old at the time of the incident and had known Defendant for many years as her stepfather. Defendant does not argue that prohibited sexual contact occurred [sic] but rather contends that he stopped when H.J. resisted. Regardless of whether Defendant eventually stopped perpetrating the rape, H.J. testified at trial that Defendant used force upon her to insert the tip of his penis inside of her vagina.

In State v. Alexander, 14-1619 (La.App. 1 Cir. 9/18/15); 182 So.3d 126, 128-29, writ denied, 15-1912 (La. 1/25/16); 185 So.3d 748, the First Circuit affirmed the defendant's conviction for attempted forcible rape where the defendant grabbed the victim from behind and wrapped his arms around the victim's waist and rib area. The victim struggled, pleaded with the defendant to let her go, and resisted but was overpowered. After picking the victim up, slamming her into a chair, and holding her down, the defendant forced the victim's legs apart and positioned himself between the victim's legs. While the defendant tried to pull down one side of the victim's leggings, her knee "popped," and she screamed in pain. The defendant released his grip, apologized, and left the house. The First Circuit held that "[a]n offender who has the specific intent to commit a rape by threatening or forcing his victim into submission and who does an act in furtherance

17

> of his goal has committed the offense of attempted forcible rape even if his victim successfully repels the threats or force." Id., at 131.
>
> As to the specific intent element for Defendant's conviction of attempted forcible rape, we find that H.J.'s testimony established that Defendant had the specific intent to commit forcible rape and that he performed an act for the purpose of, and tending directly toward, the accomplishing of his goal. H.J. testified explicitly to the multiple incidences that occurred with Defendant. As to the incident on the westbank, H.J. stated that Defendant called her back into the room when she first tried to leave and after the rape occurred, he called her a "buster" and told her to get out.
>
> After review, we find that sufficient evidence was presented as to the attempted forcible rape conviction. Additionally, the State presented evidence of the forcible rape. In Dr. Mehta's expert opinion, H.J. was able to give a very clear and detailed history of the multiple types of sexual contact that occurred with Defendant. During the CAC interviews, H.J. informed the interviewer and Dr. Mehta that the tip of Defendant's penis touched her whereas at trial, she testified that Defendant put the tip of his penis inside of her. Jurisprudence reveals that only slight penetration is required for a rape to occur. See La. R.S. 14:41(B). In Strickland, *supra*, this Court upheld the defendant's conviction for attempted forcible rape where the victim testified that the defendant only partly inserted his penis into her and was unable to complete the act because her uncle walked into the room. Id., at 888-89. Therefore, despite any inconsistencies, a reasonable jury could have found that the State proved the element of penile-vaginal penetration solely based on H.J.'s testimony at trial. See Alexander, *supra*; Dixon, *supra*.
>
> Accordingly, we find that a review of the record reveals that the evidence, when viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to have found Defendant guilty of forcible rape and to support his conviction of the responsive verdict of attempted forcible rape under the Jackson standard.[19]

In light of the foregoing compelling evidence of his guilt, it would obviously be difficult for petitioner now to establish that he was actually innocent of the crime of which he stands convicted. Moreover, the United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is required "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.

---

[19] State v. Moore, 215 So. 3d 951, 960-64 (La. App. 5th Cir. 2017); State Rec., Vol. 2 of 5.

Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995).

In the instant case, petitioner presents no new evidence whatsoever. Therefore, he cannot meet "the threshold requirement" for Perkins to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329). Accordingly, Perkins does not aid him.

Because petitioner is not entitled to statutory tolling, and because he has not established that he is eligible for equitable tolling or that the "actual innocence" exception applies, his federal application for habeas corpus relief had to be filed no later than **May 30, 2018**, in order to be timely. His application was not filed until on or after **December 6, 2018**, and, therefore, it is untimely.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that Brandon Moore's federal application seeking habeas corpus relief be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[20]

     New Orleans, Louisiana, this __29th__ day of October, 2019.

                                                       _____
                                                       **DANA M. DOUGLAS**
                                                       **UNITED STATES MAGISTRATE JUDGE**

---

[20] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.